JOSEPH v. PLATT.

(Supreme Court, Appellate Division, First Department. February 11, 1909.)

1. EVIDENCE (§ 443*)—EXTRINSIC EVIDENCE AFFECTING WRITINGS—CONTRACTS.

Defendant, sued by his wife for divorce, delivered to his attorney a separation agreement to be executed by his wife, by which he agreed to pay her $25,000, out of which were to be paid all bills including her attorney's fees. The wife refused to sign the agreement unless the bills were paid in addition to that sum. Her attorneys stated to defendant's attorney that they would pay the bills if "you will reimburse us," to which defendant's attorney assented, and, by promising to protect her from paying the bills, the wife's attorneys induced her to sign the agreement, which, however, expressly provided that all bills should be paid out of the amount paid by defendant. *Held*, that the agreement of defendant's attorney to pay the bills was a part of the preliminary negotiations and not an independent collateral agreement, so that it was merged in the written agreement afterward executed, and the wife's attorneys could not recover from defendant the amount of such bills paid by them under the agreement with his attorney.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2048–2051; Dec. Dig. § 443.*]

2. PRINCIPAL AND AGENT (§ 123*)—RELATION—EVIDENCE OF AGENCY—SUFFICIENCY—CHARACTER OF EVIDENCE.

To infer authority to act as agent where no actual authority is given, some act of the principal must be shown which gives the agent apparent authority to act, under which one dealing with the agent is entitled to assume the agent's authority.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 420–429; Dec. Dig. § 123.*]

3. PRINCIPAL AND AGENT (§ 122*)—EVIDENCE OF AGENCY—ACTS OF AGENCY—ADMISSIBILITY TO SHOW AUTHORITY.

Declarations or acts of an agent, though made in the course of the transaction, are not evidence of authority to act for the principal, and the principal is only bound by an appearance of apparent authority caused by himself, and not by that resulting from his agent's acts.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 416–419; Dec. Dig. § 122.*]

4. ATTORNEY AND CLIENT (§ 81*)—EMPLOYMENT AND AUTHORITY.

An attorney, retained to defend a divorce action, had no authority under his original retainer to contract for his client to pay the latter's wife a sum of money as a part of a separation agreement.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 141–146; Dec. Dig. § 81.*]

5. ATTORNEY AND CLIENT (§ 81*)—PROOF OF AUTHORITY—EVIDENCE OF AUTHORITY.

Where defendant, sued by his wife for divorce, prepared a writing under the terms of which he was willing to execute a separation agreement, and gave it to his attorney in the divorce suit to conclude the negotiations, his liability under the agreement cannot be extended by unauthorized statements of his attorney contrary to the written agreement prepared and signed by defendant.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 141–146; Dec. Dig. § 81.*]

6. ATTORNEY AND CLIENT (§ 72*)—PROOF OF AUTHORITY—SUFFICIENCY OF EVIDENCE—IMPLIED AUTHORITY.

In an action for certain sums which defendant's attorney agreed to pay plaintiff in addition to what defendant agreed in a separation agree-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ment to pay to plaintiff's client, evidence *held* to show that defendant's attorney had no implied authority to pay any sums other than those stipulated in the separation agreement.

[Ed. Note.—For other cases, see Attorney and Client, Dec. Dig. § 72.*]

Appeal from Trial Term, New York County.

Action by Edgar Joseph against Thomas C. Platt. From a judgment for plaintiff and an order denying a motion for new trial, defendant appealed. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

Albert B. Boardman, for appellant.
William D. Gaillard, for respondent.

INGRAHAM, J. The plaintiff brings this action as the assignee of Marsh, Winslow & Wever, who were attorneys at law, it being based upon a promise alleged to have been made by the defendant whereby he promised and agreed that he, the said defendant, would pay to the said attorneys an amount equal to the total of all the debts and obligations referred to in paragraph 4 of an agreement made between the defendant and one Lillian T. Platt, his wife, a copy of which agreement is annexed to the complaint. After setting forth this alleged agreement the complaint alleges that the said firm of Marsh, Winslow & Wever, plaintiff's assignors, paid certain debts and obligations referred to aggregating $2,471.67, and had become obligated to pay certain other indebtedness aggregating $1,125.50. Upon the trial the plaintiff obtained a verdict for the amount that his assignors had actually paid, and from the judgment entered thereon the defendant appeals. To justify a recovery therefor, the plaintiff was required to prove an independent agreement between the defendant and the plaintiff's assignors by which the defendant agreed to pay to the plaintiff's assignors the sum of money for which plaintiff has recovered a judgment. The plaintiff's assignors had no transactions directly with the defendant, but the arrangement that was made was between the plaintiff's assignors acting as attorneys for defendant's wife and one of the defendant's attorneys who had appeared to defend the action for divorce.

Upon the trial it appeared that differences had arisen between the defendant and his wife, Lillian T. Platt, and that she had commenced an action for divorce, the wife being represented by the plaintiff's assignors, and the defendant by the firm of Parker, Hatch & Sheehan. The defendant's attorneys' instructions had come from the defendant's son Frank H. Platt, an attorney at law, and under the direction of Frank H. Platt, Mr. Edward W. Hatch had conducted the negotiations on behalf of the defendant. These negotiations had proceeded to a point at which it was understood that a separation agreement should be executed, the defendant to make certain financial engagements for the support of his wife and the payment of her obligations, these payments to be guaranteed by the defendant's two sons, and this agreement had been formulated by Frank H. Platt in the form of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a written agreement of separation, stating the obligations that the defendant and his sons would be willing to assume. This proposed contract had been delivered to Mr. Hatch as the terms of the settlement which would be agreed to by the defendant. Mr. Hatch took this agreement to the office of the attorneys for the defendant's wife, the defendant's wife at that time being in the office in an adjoining room, and the agreement was there discussed in detail. This agreement was between the defendant, his wife, and one of the wife's attorneys as trustee, and Frank H. Platt and Henry B. Platt, two of the defendant's sons as guarantors. By it the defendant agreed to pay to his wife the sum of $25,000, out of which sum the trustee was to pay his charges and expenses and all sums due to the firm of which he was a member from the defendant's wife for legal services; all amounts incurred by her for legal expenses; all debts and obligations whatsoever which the defendant's wife had incurred or attempted to incur as a charge against the defendant including certain bills specified; and to pay the residue thereof to his wife. In addition, the defendant bound himself to pay to the trustee the sum of $833.33 per month for her maintenance and support, such payments to continue for a period of five years, and the wife in consideration of these payments released and discharged the defendant from all claims that she then had or may thereafter have against him of any nature whatever. And the defendant's wife further covenanted and agreed that she had not contracted any debt, obligation, or liability whatever for which the defendant or his property or estate was liable except those specified and others not exceeding in the aggregate the sum of $25,000 including her obligations to her attorneys (plaintiff's assignors), "all of which debts, obligations, and liabilities shall be paid as aforesaid by said trustee, out of said payment of twenty-five thousand dollars ($25,000), before any part of the same shall be paid over by said trustee to the party of the second part; * * * and in case the said party of the first part, or his personal representatives shall hereafter be called upon to pay or discharge, and shall in fact pay or discharge, any debt or liability heretofore or hereafter incurred or contracted by said party of the second part, then, and in every such case, it shall be lawful for the said party of the first part, or his guarantors, to deduct and retain the amount which he or they shall have so paid, together with all costs and expenses, out of any sum or sums of money then due, or thereafter to grow due, and to be paid to the said party of the second part hereunder."

With this agreement Mr. Hatch had an interview with Mr. Wever, one of the plaintiff's assignors, on November 12, 1906. According to Mr. Wever's testimony, Mr. Hatch presented this agreement to Mr. Wever for Mrs. Platt to sign, she being in an adjoining room. After the agreement had been to some extent modified, Mr. Wever presented it to Mrs. Platt who refused to sign it if these bills were to be paid out of the $25,000, that was to be paid for her benefit. After Mrs. Platt's refusal Mr. Wever left Mrs. Platt, returned to the room in which Mr. Hatch was waiting, and reported that Mrs. Platt would not sign that agreement as it then read. After further discus-

sion Mr. Hatch finally said: "We will pay all bills incurred up to September 20, 1906." This proposition was referred to Mrs. Platt who absolutely refused to pay any bills or allow any to be paid out of that fund and would not sign the agreement. Mr. Wever then went back to Mr. Hatch and reported this refusal. Mr. Wever then said to Mr. Hatch: "My firm will pay these bills provided you will reimburse us for all of the items that are incurred prior to September 20th;" to which Mr. Hatch replied: "We will do that; that is all right; we will do that." Whereupon Mr. Hatch left, and that was the end of his connection with the transaction. Subsequently Mr. Wever induced Mrs. Platt to sign the agreement upon his assurance that his firm would save her harmless from the bills, stating to her: "You sign that agreement and we will protect you, so you won't have to pay a dollar yourself on those bills," and Mrs. Platt signed the agreement on that condition. After leaving this conference Mr. Hatch left New York, sending the agreement back to Frank H. Platt who had charge of the negotiations in behalf of his father, and who was a party to the agreement as guarantor, with a letter stating the modification that had been made in the agreement. It was there stated that there was "a turbulent outburst over the bills, and it threatened to block all negotiations; indeed, I packed up my papers and told them the limit had been reached, they could accept it or let it alone, and that I was indifferent which course they pursued. This attitude did not bring the party to terms, but it did her lawyers, and they agreed with her to protect her on that account and have the instrument executed." There was nothing in this letter to indicate that there was any agreement by which the defendant should be compelled to pay anything more on account of these bills than the $25,000 that he was to pay to the trustee, and Mr. Frank H. Platt then took up the matter as it was left by Mr. Hatch when he left New York, and the agreement was finally settled and executed by all the parties, and acknowledged on the 13th or 14th of November, the $25,000 paid to the trustee, and the other terms of the agreement performed.

There are two questions presented: The first is whether under this conversation there can be spelled out an obligation of the defendant to the attorneys as distinct from the obligation to their client, his wife. And, second, whether, if there was such an agreement, Mr. Hatch had any authority or apparent authority to make such a final contract imposing a liability upon the defendant. It can hardly be disputed that all prior negotiations and understandings between the defendant and his wife or between the defendant and Mr. Wever, one of the plaintiff's assignors, as trustee, were finally merged in the written instrument subsequently executed. This agreement in the most explicit terms required these bills to be paid out of the sum of $25,000 that defendant paid to one of the plaintiff's assignors as trustee, and the trustee undertook to pay the bills before turning over any part of that sum to the defendant's wife. And it was expressly agreed that if the defendant was compelled to pay any of these bills or any other obligations of his wife he should have a right to deduct it from the moneys that were subsequently to become due to her under the agree-

ment. The subject of the defendant's liability to pay these bills as between himself and his wife and between himself and Mr. Wever was thus finally settled and determined by the execution and delivery of this agreement. None of the agreements that had been made between the parties prior to that time not expressed in the agreement survived, but after the formal execution and delivery of the agreement which took place two days after this interview, that agreement in terms expressed all of the obligations between the parties to it in relation to the payment of those bills which had been contracted by the defendant's wife, and which she claimed the defendant was liable to pay. Mr. Wever, who was one of the firm of attorneys representing the defendant's wife, expressly entered into the obligations and covenants contained in the agreement, one of which was that there should be paid to him the sum of $25,000, out of which he should pay his charges and expenses, all sums due or to become due to the firm of which he was a member, and all debts and obligations which the defendant's wife had incurred or attempted to incur as a charge against the defendant, and to render and pay the residue thereof to the defendant's wife. In considering this agreement as a whole it is somewhat difficult to separate the interests of Mr. Wever as trustee under this agreement and Mr. Wever as representing his firm acting as they were for the defendant's wife. Both Mr. Hatch and Mr. Wever were assuming to act in a strictly representative capacity, each representing clients. The whole conversation had relation to the agreement between their respective clients, which agreement was to be represented by the writing which was under consideration. The defendant and his wife had disagreed as to the payment of these bills, Mr. Hatch on behalf of the defendant claiming that the bills should be paid out of the $25,000 which Mr. Wever was to receive, and from which by the agreement formulated he was required to satisfy the bills, and Mr. Wever insisting that the bills should be paid by the defendant in addition to the $25,000; and Mr. Hatch finally said that "we" will pay the bills. If this can be said to be a final contract at all it seems to me it was clearly an obligation which would be part of the terms of the settlement and to be included in the final contract that was to be made, and not an independent or supplemental contract imposing upon the defendant an obligation to pay his wife's bills, which by the express provisions of the contract to which Mr. Wever was a party were to be paid out of the sum of $25,000 which the defendant was to pay to Mr. Wever for that purpose. Whether the promise was in form to Mr. Wever individually or as a member of the firm of which he was a member or to the defendant's wife who was a party to the agreement, seems to me to be quite immaterial. It was a part of the agreement which was the subject of negotiation and a part of the settlement between the parties, the definite terms of which were to be arranged, and were arranged, by the subsequent formal execution of the written instrument. This agreement was not by any means a supplemental or additional agreement which was not included in the settlement, but a part of the settlement itself, and in express violation of the explicit terms of the agreement which finally

represented the understanding between the parties. I think it clear that any agreement with Mr. Wever and Mr. Hatch by which the controversy between the defendant and his wife was to be settled, including the defendant's obligation to pay these bills, must be determined by the written instrument that was finally executed as representing the agreement between the parties, and as by that written instrument Mr. Wever was required to pay the bills out of the $25,-000, which had been paid to him for that purpose, neither he nor his firm could maintain an action based upon what was said in the course of the negotiations prior to the execution of the instrument as to the obligation that the defendant would perform. It seems to me, therefore, that upon the plaintiff's testimony no obligation of the defendant to pay these bills survived the formal execution of the contract.

I think the second ground relied upon by the plaintiff also precludes a recovery. It seems to have been conceded, and the court below charged the jury that, Mr. Hatch had no express authority to make any final contract in relation to this settlement, nor did he pretend to have such an authority. The court, however, submitted to the jury the question as to whether there had been conferred upon Mr. Hatch an apparent authority to make such a contract, and the verdict of the jury is based upon such an apparent or implied authority. I can find no evidence to sustain such a finding. Mr. Hatch made no representation that he had any power to finally agree upon anything during these negotiations, and upon this evidence it is entirely clear that, if Mr. Hatch had signed this written agreement containing such a clause as that sought to be enforced, the defendant could have repudiated his authority to make any binding contract. Mr. Hatch was an attorney representing his client in an action for divorce. There had been negotiations extending over a considerable period to settle the difference between the defendant and his wife, and Mr. Hatch had been furnished with a typewritten agreement which contained the conditions upon which the defendant would agree to a settlement. Certain clauses in this agreement having been objected to, various modifications were proposed, and an agreement between the attorneys so far as they could agree on behalf of their clients was arrived at. But the defendant's wife expressly repudiated the agreement that had apparently been consented to by her attorney in relation to these bills. It was then perfectly apparent that Mr. Wever had no power to bind his client to such an agreement without her consent, and there was certainly nothing to justify the inference that Mr. Hatch claimed or assumed any greater authority than Mr. Wever had to bind him. And when Mr. Hatch said that "we" will pay these bills or will pay the plaintiff's assignors the amount that they should pay to discharge the bills, being an express violation of the terms of the written proposed contract it was necessarily subject to ratification by his client. Considering the relation of the parties and the object of their negotiations, I can see no reason for saying that it could be implied that Mr. Hatch had any more authority to bind his client than Mr. Wever had to bind his. But to infer authority of an agent to bind his principal where no actual authority is proved, there must be some act

of the principal which confers upon the agent an apparent authority to act under which a third party contracting with the agent is entitled to assume that the agent has authority. No act or declaration of the agent can prove either express or implied authority. If Mr. Hatch had appeared at the office of the plaintiff's assignor; assumed to act on behalf of his clients; made a contract for his client; and expressly stated that he had authority to make such a contract—it would be no evidence to justify a finding that he had such either actual or implied authority unless he himself actually testified to the fact that he had such authority for his client to justify a finding of either actual or implied authority. Declarations of an agent, although made in the course of transactions, are never evidence of authority to act for the principal, but there must be evidence of an actual authority conferred or of acts of the principal which justified the other contracting party in assuming that the agent had authority to hold the principal responsible for a contract made by an agent.

Mr. Hatch was called as a witness for the plaintiff, and testified as to his conversations with the attorney for the defendant's wife out of which this controversy arose. There is not one word of his testimony to justify the inference that he ever had express authority to make such a contract, or of any act of the defendant or any other party to the agreement that would justify the inference of such authority. Mr. Hatch testified that he had sundry conferences with Mr. Wever of the firm of Marsh, Winslow & Wever in regard to the adjustment; that on November 12, 1906, he brought to the office of Marsh, Winslow & Wever the proposed separation agreement; that he had nothing to do with the preparation of this written agreement, ·but had received it from Mr. Frank H. Platt representing the defendant. When asked what his relations with the defendant were he said that he assumed he represented the defendant; that Frank H. Platt was the man he negotiated with; that he never had the slightest conversation with the defendant about these bills, that his negotiations in relation to them were with Mr. Frank H. Platt; that he originally received from Mr. Wever a written memorandum jotting down the heads of the bases upon which the parties might reach a compromise, that memorandum the witness gave to Mr. Frank H. Platt, and from that memorandum this agreement was drawn up by him; that he paid no attention to drawing up the agreement, but received from Mr. Frank H. Platt the agreement drawn up, and that was all the authority he had in relation to these negotiations; that he "handed all these matters over to Mr. Frank Platt, and he prepared this agreement, and when he got it in shape to suit him that suited me, and I knew that he knew enough to prepare an agreement, so I didn't think I needed to bother myself with it. And I took that agreement with me to Winslow & Wever's office that afternoon"; that he took that agreement with him from the office and left for Buffalo, and sent it back from Buffalo to Mr. Frank H. Platt, giving an account of his interview with Mr. Wever, and the whole matter was fixed up by the other parties afterwards.

It is entirely clear that Mr. Hatch under his original retainer to represent the defendant in the divorce action had no authority to make a contract binding the defendant to pay a sum of money to his wife. Bush v. O'Brien, 164 N. Y. 205, 58 N. E. 106; Lewis v. Duane, 141 N. Y. 302, 36 N. E. 322. The defendant had conferred upon Mr. Hatch no apparent authority to do anything beyond what could be implied from his original retainer to defend the divorce action. He did nothing that could justify any one dealing with Mr. Hatch in assuming that Mr. Hatch had any other or further authority. Mr. Hatch assumed no authority to make a final contract, but only to negotiate upon the basis of the proposed typewritten agreement submitted. As was said in Edwards v. Dooley, 120 N. Y. 540, 24 N. E. 827:

"While a principal is bound by his agent's acts when he justifies a party dealing with his agent in believing that he has given to the agent authority to do those acts, he is responsible only for that appearance of authority which is caused by himself, and not for that appearance of conformity to the authority which is caused only by the agent."

The case of Diamond Soda Water Mfg. Co. v. Hegeman & Co., 74 App. Div. 430, 77 N. Y. Supp. 417, does not apply, as in that case the contract that was made was a part of an oral contract for a settlement where the principal accepted the settlement made on his own behalf by an agent, and was there held bound by all of the agreement that the agent made. That case would be analogous if this clause that the plaintiff seeks to enforce was in the written agreement which Mr. Hatch had assumed to sign on behalf of the defendant, and which the defendant accepted, accepting the benefits of the agreement made for him by his agent, he would be bound by its obligations. But where the written agreement that had been proposed by the defendant or his representatives, and executed in reliance upon the fact that the defendant was limiting his liability to that expressed therein, his liability cannot be extended because of unauthorized statements made without his knowledge or authority when the subject was itself covered by the written agreement executed. In Diamond Soda Water Mfg. Co. v. Hegeman & Co., supra, the client had constituted the attorney his agent to settle and compromise a pending action, and it was because of that authority originally granted to the agent that the principal was bound by the acts of the agent. In this case there was no original authority conferred upon Mr. Hatch to settle or compromise the controversy between the defendant and his wife, and that constitutes the essential difference between that case and the case at bar.

It follows that the judgment appealed from must be reversed and a new trial ordered, with costs to the appellant to abide the event.

McLAUGHLIN, CLARKE, and HOUGHTON, JJ., concur; PATTERSON, P. J., concurs on first ground.